1  CREIM MACIAS KOENIG & FREY LLP
   SANDFORD L. FREY (Bar No. 117058)
2  sfrey@cmkllp.com
   STUART I. KOENIG (Bar No. 102764)
3  skoenig@cmkllp.com
   633 W. Fifth Street, 51st Floor
4  Los Angeles, California 90071
   Telephone: (213) 614-1944
5  Facsimile: (213) 614-1961

6  BROWN, WHITE & NEWHOUSE LLP
   GEORGE B. NEWHOUSE, JR. (Bar No. 107036)
7  gnewhouse@brownwhitelaw.com
   SYDNEY M. MEHRINGER (Bar No. 245282)
8  smehringer@brownwhitelaw.com
   333 South Hope Street, 40th Floor
9  Los Angeles, California 90071-1406
   Telephone: 213.613.0500
10 Facsimile: 213.613.0550

11 Attorneys for Debtor and Debtor In Possession
   and Plaintiff UNIQUE PREMIUM METALS,
12 INC. and Plaintiff Nelson Colton

13                **UNITED STATES BANKRUPTCY COURT**

14        **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| 15  In Re UNIQUE PREMIUM METALS, INC, | Case No.: 2:09-bk-15849-BR |
| 16      Debtor and Debtor In Possession | Chapter 11 |
| 17 | Adv. No.: |
| 18  UNIQUE PREMIUM METALS, INC., a California corporation, and NELSON COLTON an individual, | **UNIQUE PREMIUM METALS, INC. AND NELSON COLTON'S COMPLAINT FOR:** |
| 19 | |
| 20      Plaintiffs, | **(1) BREACH OF DUTY OF CARE;** |
| 21  v. | **(2) BREACH OF FIDUCIARY DUTY OF LOYALTY;** |
| 22  SIMON SIMONIAN, an individual, KARKOUR FINE JEWERLY, INC. a California Corporation, | **(3) CONVERSION;** |
| 23  REPUBLIC METALS CORPORATION, a Florida Corporation, and DOES 1-50. | **(4) INDEMNITY;** |
| 24 | **(5) CONTRIBUTION;** |
| 25      Defendants. | **(6) DECLARATORY RELIEF; AND** |
| 26 | **(7) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| 27 | |
| 28 | |

164574.2

BROWN, WHITE & NEWHOUSE™
A T T O R N E Y S

1    Plaintiffs Unique Premium Metals, Inc. and Nelson Colton allege as follows:

2                                    **JURISDICTION AND VENUE**

3        1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

4    151, 157 and 1334.

5        2.      This adversary proceeding is commenced pursuant to Rule 7001, et seq. of the

6    Federal Rules of Bankruptcy Procedure and Sections 362, 542, 543 and 549 of 11 U.S.C. § 101 et

7    seq. (the "Bankruptcy Code").

8        3.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409 because this adversary

9    proceeding arises under and in connection with a case under Title 11 which is pending in this

10   District.

11       4.      This is a "core" proceeding as defined by 28 U.S.C. Sections 157(b)(2)(A), (E), (G),

12   and (O).

13                                          **PARTIES**

14       5.      Plaintiff Unique Premium Metals, Inc. ("Unique") is a debtor and debtor-in-

15   possession in the above-referenced Chapter 11 bankruptcy case.  Unique is and at all times relevant

16   to the subject matter of this Complaint was, a corporation duly organized and existing under the laws

17   of the California, with its principal place of business in Los Angeles, California.

18       6.      Plaintiff Nelson B. Colton ("Mr. Colton") is, and at all times relevant to the subject

19   matter of this Complaint was, the President of Unique.

20       7.      Defendant Simon Simonian ("Simonian") is an individual residing in Los Angeles

21   County, California.  Simonian worked as an "employee" of Unique for fourteen years.  According to

22   a sworn declaration filed by Simonian in a related case, his "duties as an employee of Unique

23   primarily involved managing the day-to-day operations of  Unique," including "buying impure gold

24   from customers, reselling the impure gold to refiners [such as Republic], arranging shipments of

25   impure gold bars to refiners, . . . and paying Unique's obligations" which meant that Simonian was

26   entrusted with access to Unique's bank accounts.  In approximately 2007, Simonian became a Vice-

27   President of Unique, and assumed the responsibilities and fiduciary duties of an officer to the

28   company at that time.

BROWN, WHITE & NEWHOUSE™
ATTORNEYS

164574.2

8.    Plaintiffs are informed and believe, and on that basis allege, that Defendant Karkour Fine Jewelry, Inc. ("Karkour Inc.") is and at all times relevant to the subject matter of this Complaint was, a corporation duly organized under the laws of California with its principal place of business located at 606 S. Hill Street, Stall #B-2, Los Angeles, California, otherwise known as the California Jewelry Mart.

9.    Plaintiffs are advised and believe and on that basis allege that Defendant Simon Simonian, at all relevant times, was the President of Karkour Inc. and its registered agent for service of process, at 606 S. Hill Street, Stall #B-2, Los Angeles, California. According to official records maintained by the California Secretary of State, Karkour Inc. was incorporated on August 31, 2007.

10.    On information and belief, Karkour Inc. has in fact been in existence for many years, at least since 1984 at the S. Hill Street location in Downtown Los Angeles. A predecessor company known as "Karkour Fine Jewelry" ("KFJ") was a sole proprietorship, and owned by Karkour Simonian, Defendant Simon Simonian's father. On information and belief, based on publicly reported data available on the internet, Karkour's business concerned: "wholesale jewelry, watches, precious stones and precious metals," which is to say, that KFJ maintained a retail jewelry facility in the California Jewelry Mart. Unique is further informed and believes, and on that basis alleges, that prior to August 2007, Simonian was actively involved in running the day-to-day business affairs of KFJ.

11.    On information and belief, publicly available databases report an "estimated annual sales of $243,000" for KFJ. The actual business operations and affairs of Karkour did not materially change after KFJ became Karkour Inc. (The combined entity of KFJ and its successor, Karkour Inc., shall be referred to collectively as "Karkour".)

12.    On information and belief, at all relevant times, Defendant Simonian has been the principal officer responsible for the day-to-day business operations of Karkour. Karkour and Unique, at all relevant times, have been and remain competitors; to a substantial and material degree, Karkour and Unique share and compete for sources or raw gold; they provide sources of raw gold to the same refiners, notably Republic Metals Corporation, and they sell fine gold to a similar, if not overlapping, customer base.

BROWN, WHITE & NEWHOUSE
A T T O R N E Y S

1    13.    Plaintiffs are advised and believed and on that basis allege that Defendant Republic

2    Metals Corporation ("Republic") is and at all times relevant to the subject matter of this Complaint

3    was, a corporation duly organized under the laws of Florida with its principal place of business in

4    Opa Locka, Florida.

5    14.    On information and belief, pursuant to California Code of Civil Procedure § 474, the

6    fictitiously named Defendants sued in this Complaint as "John Does" 1 through 50, inclusive, and

7    each of them, were in some manner responsible or legally liable for the actions, events, transactions

8    and circumstances alleged in this Complaint.    The true names and capacities of such fictitiously

9    named Defendants, whether individual, corporate, associate, or otherwise, are presently unknown to

10    Plaintiffs and Plaintiffs will seek leave of court to amend this Complaint to assert the true names and

11    capacities of such fictitiously named Defendants when the Plaintiffs have ascertained them.

12    **GENERAL ALLEGATIONS**

13    15.    Unique commenced this bankruptcy case by filing a voluntary petition under Chapter

14    11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on March 16, 2009.    Unique is operating its

15    business and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and

16    1108 of the Bankruptcy Code.

17    16.    The business of Unique involves, to a substantial degree, the collection, processing

18    and refining of scrap metals.    Unique collects scrap gold, processes and assays the gold obtained

19    from its customers and then combines the unrefined or scrap gold into lots or unrefined gold bars

20    and sends the impure or unrefined gold to a refining company.

21    17.    From April 2007 to October 7, 2008, Simonian was the Vice President of Unique, and

22    as an officer of Unique, owed fiduciary duties of care and loyalty to Unique.

23    18.    As part of his role as Vice President of Unique, Simonian participated in the

24    management of Unique and exercised substantial discretionary authority over Unique's daily

25    operations, including its banking operations.    Simonian's responsibilities included but were not

26    limited to conducting the daily trading with Unique's customers, maintaining the daily shot log,

27    which is an accounting record detailing receipts and deliveries of fine gold in Unique's books and

28    records, and handling Unique's bank account.    Simonian also had access to Unique's vault,

4

1    maintained on the premises of Unique, in which Unique stored for safekeeping its supplies of both

2    unrefined scrap gold and fine gold.

3        19.    On information and belief, despite his status as Vice President of Unique, Simonian,

4    at some point in the past, but beginning at least as early as August 2007, became actively involved in

5    running Karkour, which also collects scrap gold from consumers, sells such scrap gold to refiners,

6    and/or exchanges scrap gold with refiners for fine gold or other valuable commodities or items of

7    value. This business directly competed with Unique, as Simonian well knew. Simonian, in a related

8    court document, admitted that "Karkour has done business with Republic . . . Both Republic and

9    Unique, however, do business with various suppliers, wholesalers, vendors and customers with

10    which/whom [sic] Karkour also does business." (*See* December 14, 2008 Declaration of Simon

11    Simonian filed in BC 399391 without attachments, attached as Exhibit A hereto)

12        20.    As Simonian has admitted, Karkour has done substantial business with Republic, a

13    Florida precious metals refining company, over the years. Unique is informed and believes, and on

14    that basis alleges, that Karkour's business with Republic consisted of selling scrap gold, which

15    Simonian gathered in the course of his business dealings as an officer of Unique, to Republic in

16    exchange for cash and/or fine gold. Unique's President, Nelson Colton, was not advised by

17    Simonian of this relationship, nor was Mr. Colton ever informed or made aware of the fact that

18    Simonian, as a principal of Karkour (and KFJ), was secretly conducting business operations that

19    directly competed with the business opportunities of Unique.

20        21.    Prior to October 2008, Republic was Unique's largest refiner and the two companies

21    had maintained an on-going business relationship over the previous ten years. During that time

22    period, Unique and Republic engaged in literally thousands of commercial transactions in which

23    Unique would sell scrap gold to Republic in exchange for cash and/or fine gold. Simonian was well

24    aware of Unique's thousands of transactions with Republic, as Simonian was personally involved in

25    facilitating many, if not all, of these transactions during various times in which he either worked for

26    Unique as an employees or served as a Vice President of Unique.

27        22.    Unique is informed and believes, and on that basis alleges, that from January 2008 to

28    June 2008, Karkour Inc., despite its overt appearance as a modest stall in the California Jewelry Mart

BROWN, WHITE & NEWHOUSE<sup>LLP</sup>
ATTORNEYS

164574.2

1    in Los Angeles, actually conducted in excess of $31,760,00 worth of business transactions involving

2    the exchange of gold and other precious metals with Republic – hundreds if not thousands of

3    transactions that Simonian kept secret from his boss, Mr. Colton, and which directly competed with

4    Unique's business, divesting Unique of valuable business opportunities and causing irreparable harm

5    to Unique.

6        23.    On information and belief, Republic and the principals of Republic, including Jason

7    Rubin, Vice President and Legal Counsel to Republic, knew that Simonian was deliberately

8    misappropriating valuable business opportunities from Unique, and deliberately encouraged,

9    fostered and facilitated such conduct by virtue of a secret agreement to assist Karkour in driving

10   Unique out of business.

11       24.    On information and belief, the motivation that Republic, Simonian and other third

12   parties had in deliberately acting to usurp corporate opportunities of Unique by Simonian, to the

13   detriment of Unique, was either drive Unique out of business by rendering the company insolvent, or

14   to so substantially and maliciously damage Unique in its business affairs that Republic and/or

15   Simonian could purchase Unique, a thriving and valuable gold business, from Mr. Colton at a greatly

16   distressed price.

17       25.    On or about March 17, 2008, pursuant to its normal course of commercial dealings

18   with Republic, and at Republic's request, Unique delivered approximately $2.73 million worth of

19   scrap gold to Republic for refining. In making this shipment, per the normal course of commercial

20   dealings between the parties, Unique understood that Republic would promptly pay for such gold,

21   after it assayed the gold to determine its precise gold content, and either wire transfer money to

22   Unique's account, or exchange a like amount of fine gold with Unique. It was the custom and

23   practice between Unique and Republic for Republic to wire payment to Unique for the scrap gold

24   early in the day after the delivery of the scrap gold.

25       26.    However, rather than pay Unique for the gold sent on March 17, 2008, Republic

26   delayed making any payment to Unique to March 19, 2008, This delay in paying Unique caused

27   Unique's  President Colton to have to borrow $1 million on March 18, 2008 to pay other

28   customers/suppliers of precious metals of Unique.  Due to their familiarity with Unique's

164574.2

traditionally thin margins both Simonian and Republic knew that withholding payment for gold shipped by Unique to Republic in good faith would likely cause serious damage to Unique's business by delaying Unique's ability to cover its debts with Unique's customers/suppliers.

27.    On or about June 19, 2008, Unique again delivered a substantial quantity of raw gold to Republic, specifically three lots of fine gold: lot 8703, which was approximately 1,255 ounces, lot 8704, which was approximately 490 ounces, and lot 8705, which was approximately 1,290 ounces.    The approximate value of this gold was $2.7 million.    It was the custom and practice between Unique and Republic for payment to be made to Unique for scrap gold delivered early in the day after the delivery of the scrap gold, and Mr. Colton, Unique's President sent the gold to Republic on the understanding that Republic would promptly pay for such gold.

28.    On the morning of June 20, 2008, Unique waited for Republic to wire payment for the gold shipped on the evening of June 19, 2008.    Rather than remit payment, as the agreement between the two companies required Republic to do, Jason Rubin ("Rubin"), Vice President of Republic, called Mr. Colton on the telephone, and informed Mr. Colton that Republic would not wire any portion of the $2.7 million to Unique to pay for the shipped metal.    When Colton insisted on immediate payment, per the terms of the parties' oral contract(s), Rubin refused unless Nelson and his wife, Laurette Colton, signed a personal guaranty to Republic, which would make the Colton's personally liable to Republic should Unique default on any of its obligations to Republic.

29.    When Mr. Colton inquired why a personal guaranty was necessary, since it was Republic that owed Unique $2.7 million for gold shipped but not paid for, Rubin responded that by saying that Republic was attempting to get additional credit with Brown Brothers Harriman & Co. ("Brown Brothers") and that Republic's financial condition had raised a problem.    According to Rubin, Brown Brothers had noticed that Republic's books showed that Unique with a varying large negative balance in its pool account, and Brown Brothers would only be comfortable extending additional credit to Republic if Mr. and Mrs. Colton signed a personal guaranty securing the debts of Unique.

30.    Jason Rubin was a trained attorney at law, whereas Nelson Colton had no legal training or experience and no ability to fathom complicated legal documents.    It was Rubin who

drafted and transmitted a complex legal document that purported to be a "personal guaranty" to Mr. Colton. (Hereafter referred to as the "Guaranty".)

31.     The Guaranty agreement provided to Mr. Colton by Jason Rubin was unconscionable because it was a contract of adhesion; it contained form terms that were incomprehensible to a layman like Mr. Colton; it was entirely drafted by Republic; it was presented to Mr. Colton on a take-it-or-leave it basis, with no room or ability for Mr. Colton to negotiate on any terms or provisions. Additionally, the Guaranty was wholly one-sided and its terms were unreasonably favorable to Republic, which was not surprising as Republic drafted the document and created the adverse economic circumstances under which they demanded that Mr. Colton sign the document. For example the guaranty lacks mutuality and purports to force Mr. Colton to waive any defenses thereto. The Guaranty, thus, was and is unconscionable and is unenforceable.

32.     As noted, the Coltons did not want to provide the Guaranty, as they were only doing business through the corporate form, and Mr. Colton as Unique's principal executive officer, respected and followed all corporate formalities. When Mr. Colton said that they would not sign the Guaranty or provide any personal guaranties wrongfully demanded by Republic, Rubin again responded that Republic would not pay Unique for the gold.

33.     Republic's unexcused breach of contract, in refusing without excuse or justification to pay for scrap gold that Unique shipped to it, placed Unique in severe economic distress and duress, as Unique had written checks totaling $2,847,834.55 to its customers who had supplied the scrap gold to the Company, and unless Unique received prompt payment for its raw gold shipped to Republic, Unique would be in default to its customers, placing Unique's economic livelihood was in dire jeopardy. These facts were well known to both Simonian, as an officer of Unique and a secret conspirator of Republic, and to Republic.

34.     Notwithstanding Republic and Rubin's wrongful threats and actions designed, on information and belief, to greatly impair the economic viability of Unique, if not destroy the company, Mrs. Colton refused to sign the guaranty. Suddenly, and without prompting from the Coltons, Simonian volunteered to sign the guaranty. Rubin indicated that Simonian's signature on the guaranty in lieu of Mrs. Colton's signature would be acceptable.

35. On information and belief, Simonian and Republic conspired to defraud Unique and Mr. Colton by leading Mr. Colton to believe that Simonian's personal guaranty to Republic was an arms' length transaction, whereas in truth and fact, Republic never intended to enforce or collect on Simonian's guaranty and the guaranty transaction was part of a secret and wholly wrongful agreement between Simonian and Republic to wrongfully and fraudulently destroy Unique. Republic's true and wrongful purpose in forcing Mr. Colton to sign the Guaranty was to exact unfair and unjustified economic coercion on Mr. Colton by withholding payment of monies that Republic knew were justly due to Unique, unless Mr. Colton agreed to provide a personal guaranty, which was otherwise entirely unsupported by any lawful consideration or purpose. For these reasons, the Guaranty is unlawful and void as against public policy.

36. Only under the aforementioned circumstances of economic duress, on account of Republic's wrongful and malicious threat to withhold payment as described herein, and in the absence of any reasonable alternative, did Mr. Colton agree to provide the Guaranty. Mr. Colton would never have agreed to provide a personal guaranty, and would not have signed the Guaranty, if he had any choice.

37. Only after Mr. Colton indicated to Rubin that he and Simonian were going to sign the Guaranty before the notary public, did Rubin wire the $2.7 million to Unique's bank account that Republic had been wrongfully withholding from Unique.

38. On information and belief, due to Simonian's profitable business relationship with Republic, Simonian knew that Republic would never look to him personally for payment for any indebtedness owed by Unique to Republic. Mr. Colton and Unique are further informed and believe and on that basis allege that Simonian signed the personal guaranty to induce Mr. Colton to sign the guaranty knowingly full well that Republic would only pursue payment from Mr. Colton. In reliance on Simonian's signature on the guaranty, Mr. Colton signed the personal guaranty believing that he would only be personally responsible for one-half of any indebtedness owed by Unique to Republic. Had Mr. Colton known the actual fact that Simonian and Republic reached an agreement or understanding that Republic would never enforce any provision of the Guaranty against Simonian, Colton would not have agreed to provide his personal Guaranty.

164574.2

39.    In the afternoon of June 20, 2008, Simonian and Mr. Colton signed the personal guaranty in favor of Republic at its behest. The personal guaranty provides that Simonian and Mr. Colton personally promise the actual and full payment of all indebtedness owed by Unique to Republic. Attached hereto as Exhibit B is a true a correct copy of the Guaranty exacted under conditions of fraud, economic duress and coercion.

40.    On June 27, Republic withheld payment for another shipment of gold that Unique sent for refining, specifically, lots 8713-8715. The value of the gold shipped on that date to Republic was approximately $4 million. Without justification, excuse or reasonable cause under the parties' oral agreements, Republic falsely claimed it was entitled to without hold payment of approximately $2.9 million because this was the amount Unique owed in its pool account. It claimed that after the $2.9 million was applied, the pool account would be netted out. These excuses were false and fraudulent, and designed, given Republic's superior market position, vis-à-vis Unique, to freeze Unique out and to cause its business to fail. In truth and fact, Republic was obligated to pay Unique approximately $4 million for the gold that had been shipped, and its claiming a false "offset" for an amount owed in a pool account was false, erroneous and made in bad faith.

41.    On July 10, 2008, Jason Rubin wrote an email to Nelson Colton and Unique apologizing for Republic's wrongful actions in wrongfully withholding payment of $2.9 million in gold sold by Unique to Republic. The email purported to explain to Mr. Colton why Republic had refused to pay for the $2.9 million shipment, claiming an "offset" instead against a disputed pool account, and attributed their wrongful actions as stemming from Republic's desperate attempts to improve their financial position with the corporation's bankers. The email, thus, stated in pertinent part as follows:

> "Dear Nelson . . . With respect to the events that occurred over the past two weeks, I am very sorry that things had to happen so suddenly. As you know, my family and I take have [sic] great respect for you and your company, and with that said we have sacrificed almost 20% of our working capital to help you grow your business. The company with which we have our line of credit (RZB) has been supportive of us over the past few years . . . [but are concerned about Republic's lack of adequate] security . . .

> * * *

> Now we are going through a tough time and we are asking for your support. This

BROWN, WHITE & NEWHOUSE^LLP
A T T O R N E Y S

credit increase is crucial to Republic's growth and success. [The credit committee in considering Republic's pending request was concerned about Republic's outstanding receivables and] . . . if our documents were not cleaned up their Tuesday it would have been another 6-8 weeks before [the credit increase] could have been revised if at all.

* * *

This has not been an easy couple of weeks for . . . Richard [Rubin, Republic's President] or myself having to deal with this. I have had sleepless nights as I'm sure you have. We would never want to hurt the people we have worked so hard to help and protect."

Rubin closed his apologetic email by promising Unique that it would engage in no further wrongful conduct, like accepting Unique's gold without paying for it: "No metal will be [with]held by Republic and everything can run smoothly." (*See* Exhibit C hereto.)

42.    On October 6, 2008, when Unique accepted a shipment of $1.8 million in fine gold from Republic, and on account of the money Republic owed to Unique, claimed an "offset" just as Republic had done only a matter of months before, Republic sued Unique, and Mr. Colton for breach of personal guaranty. Republic did not name Simonian in the Complaint despite being a co-signer of the guaranty and despite the clear language of the guaranty stating that each guarantor is jointly and severally liable to Republic.

43.    On October 3, 2008, on his second to last day at work at Unique, without authority, permission or the knowledge of Nelson Colton, Simonian wrote a check drawn on Unique's business bank account to Karkour in the amount of $400,000. At the time Simonian wrote this check, Unique owed no money to Karkour, and there was no business justification for such payment, which represented an unauthorized conversion of Unique's funds. After writing the check, Simonian endorsed the back of the check and deposited it into the bank account of Karkour. Attached hereto as Exhibit D is a true and correct copy of the check.

44.    In an effort to justify this embezzlement of Unique's funds, Simonian made the following false statement under oath: "[Prior to quitting the job with Unique] I . . . issued a $400,000 payment from Unique to Karkour Fine Jewelry, Inc., to pay off a loan of various materials that may father, who previously had been doing business as the sole proprietor of [KFJ] had made to Unique. I did so because Colton had been paying off other debts of Unique, the loan was due on demand, and, as I had previously informed Colton several times, my father had been asking for

repayment." (*See* Exhibit A.) Each of these statements is blatantly untrue. There was no "loan" between Unique and KFJ at anytime; KFJ advanced no "materials" to Unique for which Unique was indebted, and defendant Simonian never informed Mr. Colton either about the so-called "loan" or any call for repayment of same. Rather, Simonian entirely on his own, and without any authority, permission or agreement of Unique simply elected to convert $400,000 of Unique's funds. This action, on information and belief, was the final "act" in Simonian's and Republic's conspiratorial agreement to wrongfully, maliciously and fraudulently place Unique into bankruptcy.

45.    On information and belief, the plan of co-conspirators Simonian and Republic succeeded. On March 16, 2009, Unique was forced to file for reorganization under Chapter 11 of the Bankruptcy Code. On February 18, 2009, Republic filed its Second Amended Complaint in the case *Republic Metals Corporation v. Unique Premium Metals, Inc. et al*, BC 399391, which also included the cause of action for breach of personal guaranty against Mr. Colton. Again, Simonian was not named in the Second Amended Complaint.

## FIRST CAUSE OF ACTION

### (BREACH OF DUTY OF CARE)

### (By UNIQUE Against SIMON SIMONIAN and DOES 1-50)

46.    Unique re-alleges and incorporates by reference in this paragraph each and every allegation contained in paragraphs 1 through 45, inclusive, as though fully set forth at length herein.

47.    By virtue of his position as Vice President of Unique, Simonian owned Unique a duty of care to act solely in the best interests of Unique and not compete directly with Unique in its business affairs. Simonian had a duty, which he violated, not to usurp corporate opportunities that came to him by virtue of his employment with, and officer position with Unique.

48.    In deliberate, knowing and willfully malicious breach of this duty, Simonian directly competed with Unique by secretly engaging in the same business and transactions with Unique's refiners, suppliers, and customers as Unique did with those refiners, suppliers, and customers, including but not limited to, Republic. Simonian deliberately and wrongfully failed to disclose his activities to Nelson Colton, Unique's president and majority shareholder, even though Simonian knew perfectly well that Colton would like to have known such information.

BROWN, WHITE & NEWHOUSE"
ATTORNEYS

49.    In breach of this duty, Simonian directly competed with Unique by controlling and authorizing Karkour Inc. and KFJ to engage in the same business and transactions with Unique's refiners, suppliers, and customers as Unique did with largely the same refiners, suppliers, and customers, including but not limited to, Republic.

50.    As a proximate result of Simonian's breach of duty of care, Unique has suffered the loss of its business and has been injured in an amount to be proven at trial.

51.    The conduct of Simonian was willful and intentional and done with fraud, malice, and oppression, and with a conscious disregard for Unique's rights and interests such that the conduct requires the imposition of punitive damages upon Simonian in an appropriate sum to punish Simonian and to deter him from engaging in similar misconduct, the actual sum subject to proof at the time of trial.

## SECOND CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

### (By UNIQUE Against SIMON SIMONIAN and DOES 1-50)

52.    Unique re-alleges and incorporates by reference in this paragraph each and every allegation contained in paragraph 1 through 51, inclusive, as though fully set forth at length herein.

53.    By virtue of his position as Vice President of Unique, Simonian and Unique were in a fiduciary relationship. Accordingly, Simonian owned Unique a strict duty of loyalty to Unique to act always in the best interests of Unique and not to compete directly with Unique, not to usurp Unique's corporate opportunities or to steal of convert Unique's funds, to which Simonian was entrusted.

54.    In deliberate and flagrant breach of this duty, Simonian directly competed with Unique by forming Karkour Inc. and by operating Karkour Inc. in a manner that made Karkour Inc. a direct competitor with Unique.  Simonian deliberately and knowing caused Karkour Inc. to engage in the same business transactions with Unique's refiners, suppliers, and customers as Unique did. Specifically, Karkour Inc. acquired scrap gold from the same customers that Unique had, resold such scrap gold to the same refiners, that Unique used, including, but not limited to, Republic.

55.    In breach of this duty, Simonian directly competed with Unique by controlling and authorizing KFJ to engage in the same business and transactions with Unique's refiners, suppliers, and

13

164574.2

1    customers as Unique did with those refiners, suppliers, and customers including, but not limited to,

2    Republic.

3        56.    As a proximate result of Simonian's breach of his fiduciary duty, Unique has suffered

4    the loss of business, loss of profits, and has been injured in an amount to be proven at trial.

5        57.    The conduct of Simonian was willful and intentional and done with fraud, malice, and

6    oppression, and with a conscious disregard for Unique's rights and interests such that the conduct

7    requires the imposition of punitive damages upon Simonian in an appropriate sum to punish

8    Simonian and to deter him from engaging in similar misconduct, the actual sum subject to proof at

9    the time of trial.

10    **THIRD CAUSE OF ACTION**

11    **CONVERSION**

12    **(By UNIQUE Against SIMON SIMONIAN, KARKOUR, and DOES 1-50)**

13        58.    Unique re-alleges and incorporated by reference in this paragraph each and every

14    allegation contained in paragraph 1 through 57, inclusive, as though fully set forth at length herein.

15        59.    On October 3, 2008, Unique was the owner of $400,000 which it kept in a secure

16    place, namely in its bank account at Wells Fargo.

17        60.    As an officer and trusted employee of Unique, Simonian had access to Unique's bank

18    accounts, but solely to pay legitimate suppliers and claimants of Unique, and only on the direction

19    and with express authorization of Nelson Colton.

20        61.    On October 3, 2008, Simonian and Karkour Inc., and each of them, misappropriated

21    and converted for their own use and possession Unique's $400,000 by writing a check on Unique's

22    account to Karkour without permission or authorization by Unique.

23        62.    Unique owns and has an immediate right to possession of its $400,000.

24        63.    As a direct and proximate result of Simonian and Karkour's conversion of Unique's

25    $400,000, Unique has suffered the loss of use and possession of its money and has been damaged in

26    the amount of $400,000.

27        64.    The conduct of Simonian and Karkour, and each of them, was willful and intentional

28    and done with fraud, malice, and oppression, and with a conscious disregard for Unique's rights and

164574.2

BROWN, WHITE & NEWHOUSE ᴸᴸᴾ
ATTORNEYS

1  interests such that the conduct requires the imposition of punitive damages upon Simonian and

2  Karkour, and each of them, in an appropriate sum to punish Simonian and Karkour, and each of

3  them, to deter them from engaging in similar misconduct, the actual sum subject to proof at the time

4  of trial.

### FOURTH CAUSE OF ACTION

### EQUITABLE INDEMNITY

### (By NELSON COLTON Against SIMON SIMONIAN and DOES 1-50)

8      65.    Mr. Colton re-alleges and incorporate by reference in this paragraph each and every

9  allegation contained in paragraphs 1 through 64, inclusive, as though fully set forth at length herein.

10      66.    Mr. Colton denies that either he or Unique is liable to Republic on any account.  If,

11  however, Republic should recover any sums from Mr. Colton as alleged in its Second Amended

12  Complaint, then any liability and/or damages imposed on Mr. Colton will have been directly and

13  proximately caused, in whole or in part, by the wrongful acts and/or omissions of Simonian, including

14  Simonian's conspiratorial actions against the business of Unique.  Simonian induced Mr. Colton to sign

15  the personal guaranty under the false pretense that Simonian would be jointly responsible, along with

16  Mr. Colton, for any indebtedness owed by Unique to Republic.  However Simonian knew full well that

17  due to his profitable and secretive working relationship with Republic, Republic would never attempt to

18  enforce the guaranty against him.  Indeed, although Republic claims that Unique is indebted to it,

19  Republic did not name Simonian as a joint defendant in its Second Amended Complaint.

20      67.    Mr. Colton has now been required by the wrongful conduct of Simonian to act in

21  protection of his own interests by defending against the Republic's Second Amended Complaint.

22      68.    By reason of the alleged conduct of Simonian, in equity and good conscience, if it is

23  determined that Mr. Colton is liable to Republic by reason of the Second Amended Complaint, then Mr.

24  Colton is entitled to equitable indemnification and to recover from Simonian any and all damages

25  caused to him by Simonian.

26  / / /

27  / / /

28  / / /

164574.2

## FIFTH CAUSE OF ACTION

## CONTRIBUTION

## (By NELSON COLTON Against SIMON SIMONIAN and DOES 1-50)

69.     Mr. Colton re-alleges and incorporate by reference in this paragraph each and every allegation contained in paragraphs 1 through 68, inclusive, as though fully set forth at length herein.

70.     By reason of the foregoing, if Mr. Colton is required to pay damages or any other sums arising from the Complaint of Republic, Simonian is jointly and severally liable for any such sums paid and Mr. Colton is entitled to contribution from Simonian for any sums recovered by Republic.

## SIXTH CAUSE OF ACTION

## DECLARATORY RELIEF

## (By NELSON COLTON Against REPUBLIC METALS CORPORATION and DOES 1-50)

71.     Mr. Colton re-alleges and incorporates by reference in this paragraph each and every allegation contained in paragraphs 1 through 70, inclusive, as though fully set forth at length herein.

72.     There exists an actual and present controversy between Mr. Colton and Republic concerning their respective rights and duties under the Guaranty. Mr. Colton contends that as a result of the fraud, coercion and economic duress inflicted upon him by Republic, as well as Republic's conspiratorial plan with Simonian to trick Mr. Colton into signing the Guaranty and to force Unique into insolvency or bankruptcy so Simonian or Republic could acquire the company for a fraction of its true worth, the personal guaranty is invalid, void and unlawful as it contravenes the public policy of the State of California. The Guaranty is also invalid as a contract of adhesion and unconscionable in application.

73.     Mr. Colton is informed and believes and on that basis alleges that Republic contends that the Guaranty is valid and Mr. Colton is liable under it.

74.     Mr. Colton desires a judicial declaration concerning his rights and duties under Guaranty vis-à-vis Republic. Specifically Mr. Colton desires a judicial declaration that the Guaranty is void, invalid and unenforceable, and that he cannot be held liable under it.

164574.2

## SEVENTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (By UNIQUE Against KARKOUR and REPUBLIC METALS

### CORPORATION and DOES 1-50)

75.    Unique re-alleges and incorporates by reference in this paragraph each and every allegation contained paragraphs 1 through 74, inclusive, as though fully set forth at length herein.

76.    Beginning in 1991, there existed an economic relationship between Unique and its customers. This relationship had the probability of future benefit to Unique because Unique could reasonably anticipate that it would continue to do business with its customers, provided that Unique was able to pay its customers promptly for precious metals.

77.    Karkour and Republic knew of this relationship by virtue of Simon Simonian's role as employee and Vice President of Unique and by virtue of Republic's ten year business relationship with Unique. Republic also knew of these relationships by virtue of the fact that Republic was allowed to keep an employee, John Argenziano, at Unique's facilities.

78.    By conspiring to steal Unique's customers and facilitating and aiding and abetting Karkour in engaging in competition with Unique, *i.e.* selling scrap gold to refiners in exchange for money or fine gold, Karkour and Republic intentionally interfered with the economic relationship between Unique and its customers. These acts were wrongful, independent of any interference with the economic relationship between Unique and its customers. The purpose and secret motivation of Karkour, Simonian and Republic in acting to interfere with the economic relationship between Unique and its customers was to substantially impair Unique as a going concern, if not destroy the company, so either Simonian or Republic or other third parties close to them could acquire the Unique at distressed prices.

79.    The economic relationship between Unique and its customers was interfered with because Karkour and Republic did, in fact, and have siphoned away customers and/or the business of the customers, which otherwise would have gone to Unique.

80.    As a result of Karkour and Republic's actions, Unique has been damaged in an amount to be proven at trial.

17

164574.2

81.     Karkour and Republic intentionally, maliciously, wrongfully, and purposefully interfered with Unique's economic relationship with its customers.  Such conduct was done with a conscious disregard for Unique's rights and with the intent of causing harm to Unique.  Accordingly, Unique is entitled to an award of exemplary and/or punitive damages against Karkour and Republic.

### PRAYER FOR RELIEF

Wherefore Plaintiffs Unique Premium Metals, Inc. and Nelson Colton pray for judgment as follows:

### On The First and Second Causes of Action

1.     For compensatory damages in an amount to according to proof at trial;

2.     For punitive damages;

3.     For the costs of suit incurred herein; and

4.     For any other relief that the Court deems just and proper.

### On The Third Cause of Action

1.     For $400,000 together with interest thereon at a legal rate;

2.     For punitive damages;

3.     For the costs of suit incurred herein; and

4.     For any other relief that the Court deems just and proper.

### On The Fourth Cause of Action

1.     If any sums are awarded against Nelson Colton as a result of the incidents and occurrences described in Republic Metals Corporation's Second Amended Complaint, for judgment against Simon Simonian indemnifying Nelson Colton for those amounts, according to proof at the time of trial;

2.     For the costs of suit incurred herein; and

3.     For any other relief that the Court deems just and proper.

### On The Fifth Cause of Action

1.     If any sums are awarded against Nelson Colton as a result of the incidents and occurrences described in Republic Metals Corporation's Second Amended Complaint, for full contribution from Simon Simonian according to proof at the time of trial;

164574.2

1    2.    For the costs of suit incurred herein; and

2    3.    For any other relief that the Court deems just and proper.

3    **On The Sixth Cause of Action**

4    1.    For a judicial declaration that the Guaranty is void, unenforceable and invalid and that

5    Mr. Colton, as an individual, has no liability to Republic Metals Corporation for the incidents and

6    occurrences described in its Second Amended Complaint.

7    2.    For the costs of suit incurred herein; and

8    3.    For any other relief that the Court deems just and proper.

9    **On The Seventh Cause of Action**

10   1.    For compensatory damages in an amount to according to proof at trial;

11   2.    For punitive damages;

12   3.    For the costs of suit incurred herein; and

13   4.    For any other relief that the Court deems just and proper.

14

15   DATED: July 13, 2009                    BROWN, WHITE & NEWHOUSE LLP

16                                           By _____

17                                              GEORGE B. NEWHOUSE, JR.
                                                SYDNEY M. MEHRINGER
18                                              Attorneys for Debtor and Debtor-In-Possession
                                                and Plaintiff UNIQUE PREMIUM METALS,
19                                              INC. and Plaintiff NELSON COLTON

20

21

22

23

24

25

26

27

28

19

164574.2

**B104 (FORM 104) (08/07)**

# ADVERSARY PROCEEDING COVER SHEET
### (Instructions on Reverse)

| ADVERSARY PROCEEDING NUMBER |
|---|
| (Court Use Only) |

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Unique Premium Metals, Inc., a California corporation, and Nelson Colton an individual | Simon Simonian, an individual, Karkour Fine Jewelry, Inc., a Calif. Corp., Republic Metals Corp., a Florida Corp., and Does 1-50 |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| George B. Newhouse, Jr.<br>BROWN, WHITE & NEWHOUSE LLP<br>333 South Hope Street, 40th Floor<br>Los Angeles, CA  90071-1406<br>(213) 613-0500 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| [X] Debtor   [ ] U.S. Trustee/Bankruptcy Admin<br>[ ] Creditor   [ ] Other<br>[ ] Trustee | [ ] Debtor   [ ] U.S. Trustee/Bankruptcy Admin<br>[ ] Creditor   [ ] Other<br>[ ] Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

This is an action by Unique against its former employee and Vice President, Simon Simonian, for breach of his fiduciaries to Unique as well as conversion of corporate funds.  In breach of his fiduciary duties of care and loyalty, Simonian secretly competed with Unique by starting his own business, Karkour Fine Jewelry, Inc., which engaged in exactly the same business as Unique.  Karkour even utilized the same refinery as Unique: Republic Metals Corporation.  Unique also sues Republic Metals Corporation for interference with Unique's business opportunities.  Thus is also an action by Nelson Colton, Unique's president, against Simonian and Republic for declaratory relief, indemnity, and contribution relating to a personal guaranty that Mr. Colton signed under the influence of Simonian's and Republic's economic duress, coercion, and fraud.

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
[ ] 11-Recovery of money/property – §542 turnover of property
[ ] 12-Recovery of money/property – §547 preference
[ ] 13-Recovery of money/property – §548 fraudulent transfer
[X] 14-Recovery of money/property – other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
[ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
[ ] 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
[ ] 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
[ ] 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
[ ] 66-Dischargeability – §523(a)(1),(14),(14A) priority tax claims
[ ] 62-Dischargeability – §523(a)(2), false pretenses, false representation, actual fraud
[ ] 67-Dischargeability – §523(a)(4), fraud as fiduciary, embezzlement, larceny
(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
[ ] 61-Dischargeability – §523(a)(5), domestic support
[ ] 68-Dischargeability – §523(a)(6), willful and malicious injury
[ ] 63-Dischargeability – §523(a)(8), student loan
[ ] 64-Dischargeability – §523(a)(15), divorce or separation obligation (other than domestic support)
[ ] 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
[ ] 71-Injunctive relief – imposition of stay
[ ] 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
[ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
[X] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
[ ] 01-Determination of removed claim or cause

**Other**
[ ] SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
[ ] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| [X] Check if this case involves a substantive issue of state law | [ ] Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| [ ] Check if a jury trial is demanded in complaint | Demand  $ |

**Other Relief Sought**

B104 (FORM 104) (08/07), Page 2

| NAME OF DEBTOR<br>UNIQUE PREMIUM METALS, INC. | | BANKRUPTCY CASE NO.<br>2:09-bk-15849-BR | |
| --- | --- | --- | --- |
| DISTRICT IN WHICH CASE IS PENDING<br>CENTRAL | DIVISION OFFICE<br>Los Angeles | | NAME OF JUDGE<br>Hon. Barry Russell |
| PLAINTIFF<br><br>Republic Metal Corporation | DEFENDANT<br><br>Unique Premium Metals, Inc. et al. | | ADVERSARY<br>PROCEEDING NO.<br>2:09-ap-01526-BR |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br>CENTRAL | DIVISION OFFICE<br>LOS ANGELES | NAME OF JUDGE<br>Hon. Barry Russell | |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>*George B. Newhouse by SMM* | |
| --- | --- |
| DATE<br>July 14, 2009 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>George B. Newhouse, Jr. |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Attorney or Party Name, Address, Telephone & FAX Numbers and California State Bar Number

FOR COURT USE ONLY

Brown, White & Newhouse, LLP
George B. Newhouse, Jr. (Bar No. 107036) - gnewhouse@brownwhitelaw.com
Sydney M. Mehringer (Bar No. 245282) - smehringer@brownwhitelaw.com
333 S. Hope Street, 40th Floor
Los Angeles, CA 90071
Telephone: (213) 613-0500
Fax: (213) 613-0550

*Attorney for Plaintiff* Unique Premium Metals, Inc.

| UNITED STATES BANKRUPTCY COURT CENTRAL DISTRICT OF CALIFORNIA | |
|---|---|
| In re: UNIQUE PREMIUM METALS, INC., <br><br> Debtor. | CHAPTER  11 <br><br> CASE NUMBER  2:09-bk-15849-BR <br><br> ADVERSARY NUMBER |
| Unique Premium Metals, Inc., a California corporation, and Nelson Colton, an individual, Plaintiff(s), <br><br> vs. <br><br> Simon Simonian, an individual, Karkour Fine Jewelry, Inc., et al. Defendant(s). | *(The Boxes and Blank Lines below are for the Court's Use Only) (Do Not Fill Them In)* <br><br> **SUMMONS AND NOTICE OF STATUS CONFERENCE** |

TO THE DEFENDANT: A Complaint has been filed by the Plaintiff against you. If you wish to defend yourself, you must file with the Court a written pleading, in duplicate, in response to the Complaint. You must also send a copy of your written response to the party shown in the upper left-hand corner of this page. Unless you have filed in duplicate and served a responsive pleading by _____, the Court may enter a judgment by default against you for the relief demanded in the Complaint.

A Status Conference on the proceeding commenced by the Complaint has been set for:

| Hearing Date: | Time: | Courtroom: | Floor: |
|---|---|---|---|
| ☒  **255 East Temple Street, Los Angeles** | | ☐  **411 West Fourth Street, Santa Ana** | |
| ☐  **21041 Burbank Boulevard, Woodland Hills** | | ☐  **1415 State Street, Santa Barbara** | |
| ☐  **3420 Twelfth Street, Riverside** | | | |

PLEASE TAKE NOTICE that if the trial of the proceeding is anticipated to take less than two (2) hours, the parties may stipulate to conduct the trial of the case on the date specified, instead of holding a Status Conference. Such a stipulation must be lodged with the Court at least two (2) Court days before the date set forth above and is subject to Court approval. The Court may continue the trial to another date if necessary to accommodate the anticipated length of the trial.

Date of Issuance: _____

**JON D. CERETTO**
**Clerk of the Bankruptcy Court**

By: _____
        *Deputy Clerk*

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009 (COA-SA)*

**F 7004-1**

**F 7004-1**

| In re                                    (SHORT TITLE)<br>UNIQUE PREMIUM METALS, INC.,<br><br>                                                    Debtor(s). | CASE NO.: 2:09-bk-15849-BR |
|---|---|

**NOTE**: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:


A true and correct copy of the foregoing document described as _____
_____ will be served or was served **(a)** on the judge
in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:


**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General
Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to
the document.   On _____ I checked the CM/ECF docket for this bankruptcy case or adversary
proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at
the email addressed indicated below:


☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this
bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States
Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow.  Listing the judge here constitutes
a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.


☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity
served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s)
and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission
and/or email as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later
than 24 hours after the document is filed.


☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| _____ | _____ | _____ |
|---|---|---|
| _Date_ | _Type Name_ | _Signature_ |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_January 2009 (COA-SA)_                                                                                    **F 7004-1**

**F 7004-1**

| In re                          (SHORT TITLE) | CASE NO.: 2:09-bk-15849-BR |
|---|---|
| UNIQUE PREMIUM METALS, INC.,                          Debtor(s). | |

**ADDITIONAL SERVICE INFORMATION** (if needed):

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009 (COA-SA)*

**F 7004-1**